IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BASIC RESEARCH, LLC, et al.,<br><br>              Plaintiffs,<br><br><br><br>              vs.<br><br><br><br>FEDERAL TRADE COMMISSION and<br>THE UNITED STATES OF AMERICA,<br><br>              Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br><br>Case No. 2:09-cv-0779 CW |

## INTRODUCTION

On June 19, 2006, the Federal Trade Commission ("FTC") issued a Decision and Order that

reflected the terms of a settlement agreement between Basic Research[1] and the FTC. Before Basic

Research can make representations about its products in advertisements, it must "possess and rely

upon a reasonable basis for the representation, which shall consist of competent and reliable

scientific evidence."[2] Basic Research contends it bargained for this "reasonable basis" standard and

that the FTC is now trying to eliminate that standard from the agreement by imposing extra-

contractual terms and conditions. Basic Research seeks a declaratory judgment asking the court to

---

[1]  "Basic Research" collectively refers to Plaintiffs Basic Research, LLC and its affiliates
Sovage Dermalogic Laboratories, LLC, The Carter-Reed Company, LLC, and Dynakor Pharmacal,
LLC, as well as A.G. Waterhouse, LLC, Dennis Gay, and Mitchell K. Friedlander.

[2]  FTC Order, 4 (Dkt. No. 1, Ex. A).

determine the meaning of the "reasonable basis" standard. The FTC contends the court must dismiss the case because the court lacks jurisdiction to hear Basic Research's Complaint and Basic Research's Complaint impinges upon an enforcement action that the FTC has brought against Basic Research. In contrast, Basic Research contends its Complaint and the FTC's enforcement action should be consolidated. The FTC opposes consolidation. For the reasons stated below, the court denies the FTC's motion to dismiss and grants Basic Research's motion to consolidate.

## FACTUAL BACKGROUND[3]

Basic Research manufactures, distributes, and sells dietary supplements called Akävar™ ("Akavar") and Relacore™ ("Relacore"). Akavar is "a supplement containing a patented herbal combination of Yerbe Mate, Guarana and Damiana ('YGD')," which purportedly caused "significant weight loss among test subjects who took the YGD combination [fifteen] minutes before main meals and who were specifically instructed not to change their diet or exercise routines."[4] Relacore is a supplement designed to reduce stress-related belly fat when used in conjunction with diet and exercise.[5]

A function of the FTC is to ensure truth-in advertising. This means the "advertising must be truthful and not misleading," and that "before disseminating an ad, advertisers must have

---

[3] Because the court is addressing a motion to dismiss, it generally accepts for purposes of this motion that the facts alleged in Basic Research's Complaint are true. Basic Research attached exhibits to its Complaint, which the court may consider as part of the Complaint. To the extent there are any inconsistencies between the Complaint and the attached documents, the documents speak for themselves and the court cites the facts stated in those documents.

[4] Pls.' Compl. for Declaratory Relief, 24, ¶ 86 (Dkt. No. 1).

[5] *Id.*

adequate substantiation for all objective product claims."[6]  The FTC contends that Basic Research's

advertising claims for Akavar and Relacore are misleading and unsubstantiated.  Basic Research

asserts, however, that the FTC is using an improper standard for its evaluations and that the court

must look to previous litigation between the parties to determine the proper standard.

**Prior Proceedings**

The previous litigation involved two separate proceedings.  In June 2004, the FTC

commenced an administrative action ("Administrative Action") against some of the plaintiffs in this

action.[7]  In that proceeding, the FTC alleged that Basic Research's advertisements for dietary

supplements contained unsubstantiated claims and false representations.[8]  The dietary supplements

in that action did *not* involve Akavar or Relacore.  Shortly thereafter, however, the FTC also sent

a notice to The Carter-Reed Company ("Carter-Reed"), which does sell Relacore.[9]  The notice stated

that Carter-Reed's advertising claims for Relacore appeared to be unsubstantiated.  The notice

advised Carter-Reed that if the claims were unsubstantiated, it "should discontinue these claims

_____

[6]  *See* FTC, Bureau of Consumer Protection, Dietary Supplements: An Advertising Guide for Industry, § II, at 3 (Apr. 2001) (available at *http://business.ftc.gov/documents/bus09-dietary-supplements-advertising-guide-industry*).

[7]  The Administrative Action asserted claims against Basic Research, LLC; A.G. Waterhouse, L.L.C.; Sovage Dermalogic Laboratories, L.L.C.; Dennis Gay; Mitchell K. Friedlander, and other related entities.  It did not specifically assert claims against The Carter-Reed Company, LLC and Dynakor Pharmacal, LLC.  For ease of reference, however, the court also refers to the parties involved in the Administrative Action as "Basic Research."

[8]  Defs.' Mot. to Dismiss, 2 (Dkt. No. 9).

[9]  Carter-Reed is an affiliate of Basic Research.  Pls.' Compl. for Declaratory Relief, 5, ¶ 8 (Dkt. No. 1).

immediately."[10]  In response, Carter-Reed filed a complaint against the FTC in December 2004 to enjoin the FTC from interfering with Carter-Reed's purported constitutionally-protected commercial speech.[11]

In both the Administrative Action and the Carter-Reed Action, the FTC asserted that the standard for substantiation was "competent and reliable scientific evidence."[12]  Basic Research alleged that the "competent and reliable scientific evidence" standard had no specific definition or meaning and was vague and subjective because the "FTC refused to identify any specific type, level, quantity or quality of 'scientific evidence' that" would be sufficient to meet the standard.[13]

After two years of litigation, both actions were ultimately resolved by agreement "in accordance with the Commission's Rule governing consent order procedures" (the "Agreement").[14] The Agreement contemplated that it would be submitted to the Commission for incorporation into an order.  In so doing, the Agreement specified the administrative "complaint may be used in construing the terms of the order.  No agreement, understanding, representation, or interpretation not contained in the order or in the agreement may be used to vary or contradict the terms of the order."[15]  On June 19, 2006, the FTC did, in fact, issue a Decision and Order (the "Order") that

---

[10]  Mot. to Dismiss, 2 (Dkt. No. 11 in Case No. 2:04-cv-1142) (emphasis omitted).

[11]  Pls.' Compl. for Declaratory Relief, 16, ¶ 58.

[12]  *See id.* at 16–17, ¶¶ 59–61.

[13]  *See id.* at 15–17, ¶¶ 49–62.

[14]  Agreement Containing Consent Order, 1 (unsigned copy may be located at http://www.ftc.gov/os/adjpro/d9318/DocketNo9318BasicResearchAgreementText.pdf) (hereinafter "Agreement").

[15]  *Id.* at 2, ¶ 6.

largely incorporates the terms of the Agreement.[16]   Basic Research contends the Agreement

constitutes an enforceable contract where the parties bargained for the terms and exchanged valuable

consideration.[17]

In particular, Basic Research and the FTC agreed, among other things, that when Basic

Research makes representations about its products, it must "possess and rely upon a reasonable basis

for the representation, which shall consist of competent and reliable scientific evidence."[18]   The

Agreement and Order both define "competent and reliable scientific evidence" as follows:

> Competent and reliable scientific evidence shall mean tests, analyses,
> research, studies, or other evidence based on the expertise of
> professionals in the relevant area, that has been conducted and
> evaluated in an objective manner by persons qualified to do so, using
> procedures generally accepted in the profession to yield accurate and
> reliable results.[19]

Basic Research alleges that under the Agreement and Order the FTC must accept evidence that

meets the "reasonable basis standard" defined in the documents and that the FTC is not free "to

impose additional extracontractual requirements and obligations that were not negotiated and agreed

upon by the parties."[20]   Basic Research asserts that it demanded this fixed, definite standard to

prevent the FTC from imposing on a case-by-case basis its subjective view of what constituted

---

[16]  *See* Decision & Order (Dkt. No. 1, Ex. A).

[17]  Although Basic Research refers to the Agreement in its Compliant, it cites to the Order
rather than the Agreement.  The relevant terms, however, are the same in the Agreement and the
Order.

[18]  Agreement, at 3, §§ I–II; *see also* FTC Order, 4–5, §§ I–II (Dkt. No. 1, Ex A).

[19]  Agreement, at 4, ¶ 2; FTC Order, at 4, ¶ 2.

[20]  Pls.' Compl. for Declaratory Relief, 20, ¶ 72 (Dkt. No. 1).

"competent and reliable scientific evidence."[21]

In exchange for this set standard, although Carter-Reed was not named in the Administrative Action, Basic Research agreed it would have Carter-Reed dismiss its complaint against the FTC. Basic Research further agreed (1) to pay the FTC three million dollars and (2) to waive its damage claims it had against the FTC and members of the FTC's staff.[22]  Basic Research and Carter-Reed fulfilled each of these obligations.

Section XII of the Agreement and Order requires Basic Research to file periodic compliance reports with the FTC that "set[] forth in detail the manner and form in which [Basic Research has] complied with this order."[23]  Consequently, Basic Research filed a report on or about September 28, 2006.  In the report, Basic Research provided its substantiation for the weight loss and fat loss claims it made in its Akavar and Relacore advertisements.[24]

**Akavar Advertisements**

In a November 2, 2007 letter ("November 2 Letter"), the FTC informed Basic Research that it had concluded Plaintiffs were in violation of the Agreement.[25]  In this letter, the FTC stated that

---

[21]  *Id.* at 20–21, ¶ 73.

[22]  Agreement, *supra* note 14, at 1, 3.  Basic Research's damage claims related to the  FTC's violation of a protective order entered in the Administrative Action and violation of related federal statutes.  Pl.'s Compl for Declaratory Relief, 19–20, ¶ 70 (Dkt. No. 1).  The purported violations occurred when the FTC published on the Internet Basic Research's confidential financial and trade secret information, which publication was prohibited by the terms of the protective order and federal law.  *Id.*

[23]  FTC Order, at 8, § XII (Dkt. No. 1, Ex. A).

[24]  Pls.' Compl. for Declaratory Relief, 25, ¶ 90 (Dkt. No. 1).

[25]  *Id.* at 37, ¶ 143; Nov. 2 Letter, 1 (Dkt. No. 1, Ex. C).

certain of Basic Research's advertising claims were not substantiated.[26]  Although Basic Research

provided evidence from an "Andersen/Fogh study" to show its Akavar claims were supported, the

FTC concluded it was not competent and reliable scientific evidence.[27]  Among other complaints,

the FTC stated the following in the November 2 Letter:

> <u>Explanation of Violation</u>: Advertisements for Akavar represent that
> users can eat all they want and still lose weight, which conveys the
> implied claim that users can eat unlimited amounts of food and still
> lose weight.  The Anderson/Fogh study does not constitute competent
> and reliable scientific evidence that users taking Akavar can eat
> unlimited amounts of food and still lose weight . . . .[28]

The FTC then stated if Plaintiffs

> could substantiate a claim that the product reduces appetite, a claim
> that people using the product can eat what they want would not
> necessarily violate the Order so long as the advertising discloses
> clearly and conspicuously that users will not want to eat as much
> food as before they started using the product.[29]

Although Basic Research believed the materials it had submitted met the "reasonable basis"

standard, it nevertheless submitted additional materials to substantiate its advertising claims.  On

December 17, 2007, Basic Research's "counsel, in-house compliance officer and [Mr.] Friedlander

traveled to Washington, D.C., to meet with James Kohm, Associate Director of the Enforcement

Division, Bureau of Consumer Protection at the FTC, and members of his staff."[30]  During the

---

[26]  Nov. 2 Letter, 2 (Dkt. No. 1, Ex. C).

[27]  *Id.*

[28]  *Id.* at 3.

[29]  *Id.* at 4.

[30]  Pls.' Compl. for Declaratory Relief, 40, ¶ 154 (Dkt. No. 1).

meeting, Mr. Kohm stated that Basic Research could assert "Eat All You Want And Still Lose Weight" in the Akavar advertisements as long as Basic Research clearly stated "that consumers taking Akavar can 'eat all they want and still lose weight' because they will want to eat less."[31]

After the meeting, Basic Research incorporated the following language into is advertisement: "Losing weight is all about reducing caloric intake, and Akavar is a new-generation calorie-restricting compound that *lets you eat all you want . . . because you want to eat less*."[32] The italicized language was highlighted in a prominent box on the top of the page.

In a February 20, 2008 letter, among other things, the FTC informed Basic Research that the new language was insufficient because the advertisement's headline was much more "prominent and dramatic" than the font in the box and the modified language in the box was not physically close enough to the headline.[33] The modified language was seven lines-down from the headline on a full-page, two-column advertisement.[34] Additionally, while the modified language was in a smaller font than the headline, its font was larger than other language outside of the box.[35] The FTC also contended again that the Andersen/Fogh study did not support Basic Research's advertising claims for Akavar. Basic Research therefore submitted more material to the FTC to substantiate its

---

[31] *Id.* at 40, ¶ 155.

[32] Akavar Advertisement (layout Jan. 1, 2008) (Dkt. No. 1, Ex. D) (omission in original) (emphasis added).

[33] February 20, 2008 Letter, 2 (Dkt. No. ,1 Ex. E).

[34] Akavar Advertisement (Dkt. No. 1, Ex. D).

[35] *Id.*

claims.[36]  On March 14, 2008, Basic Research' counsel and Mr. Friedlander again met with Mr. Kohm and FTC staff attorneys.[37]  During the meeting, the FTC admitted that the Andersen/Fogh study actually did "provide[] some evidence of an appetite suppressing effect."[38]  Contrary to prior representations, however, the FTC said even if Basic Research clearly and conspicuously stated in its advertisements "that you eat all you want because you want to eat less," it would be insufficient.[39]  Now Basic Research's statements about appetite suppression had to be "qualified" by also describing "the limited scientific basis for this effect."[40]  Because Basis Research's modified advertisements did not contain this qualified language, the FTC informed Basic Research its claims still violated the Agreement.

Consequently, during this same meeting, the FTC threatened "that it would initiate an enforcement action against [Basic Research] if [it] did not immediately pull all advertising for Akavar and run only advertisements containing 'qualified' weight loss claims."[41]  Basic Research asserts, again in an effort to avoid litigation with the FTC, that it immediately pulled all of its Akavar television and print advertising that did not have firm commitments.[42]

Basic Research then revised its Akavar advertisement a second time.  It removed "Eat All

---

[36]  Pls.' Compl. for Declaratory Relief, 43, ¶ 164 (Dkt. No. 1).

[37]  *Id.* at 43, ¶ 165.

[38]  FTC Letter (Mar. 21, 2008) (Dkt. No. 1, Ex. G).

[39]  *See id.*

[40]  *Id.*

[41]  Pls.' Compl. for Declaratory Relief, 44, ¶ 170 (Dkt. No. 1).

[42]  *Id.* at 45, ¶ 173.

You Want And Still Lose Weight" as the headline for the advertisement and moved it to the headline of a small box (2 inch x 1 inch) on the page .[43]  Basic Research also incorporated language that informed consumers that Akavar had "created a firestorm of controversy" because some experts believed the weight-loss claims were "fully substantiated" and others experts thought the claims "go much too far" and have "express[ed] complete outrage."[44]  Basic Research submitted the revised advertisement to the FTC on March 25, 2008.[45]

On March 27, 2008, counsel for the parties again met.[46]  During this meeting, the FTC informed Basis Research that "just meeting the letter of the standard" stated in the Agreement was not enough.[47]  Basic Research had to make more qualifying statements in its advertisements such that consumers would understand the supporting scientific evidence for the product was "somewhere in between no support and the gold standard."[48]  The FTC further informed Basic Research that the Agreement's reasonable basis standard was "fluid" and changed "depending on what the scientific evidence is—it's always different."[49]  Additionally, the FTC informed Basic Research that it had to remove the small box from the advertisement.[50]  Finally, the FTC informed Basic Research that it

---

[43]  Second Revised Akavar Advertisement (Dkt. No. 1, Ex. H).

[44]  *Id.*

[45]  Pls.' Compl. for Declaratory Relief, 47, ¶ 180 (Dkt. No. 1).

[46]  *Id.* at 47, ¶ 181.

[47]  *Id.* at 47, ¶ 183 (quotations omitted).

[48]  *Id.* at 48, ¶¶ 184, 186.

[49]  *Id.* at 48, ¶ 189 (quotations omitted).

[50]  *Id.* at 49, ¶ 193.

believed Basic Research had acted in bad faith by making a limited placement of the revised advertisement before it had been approved by the FTC.[51]

Accordingly, Basic Research revised its Akavar advertisement a third time.  It removed the small box, included more detail about a study, and added specific comments that had been made to controvert the validity of the study.[52]  It then included the following language at the bottom of the first column,  "And then there's the ad's provocative "Eat All You Want and Still Lose Weight Headline."[53]  It next quotes from the FTC's own website about what is permissible to state in the advertisement.[54]  Basic Research placed the third revised advertisement in two publications to meet an advertising deadline.[55]  It then sent the revised advertisement to the FTC on April 15, 2008 and the parties met again on April 16, 2008.[56]

In the meeting, the FTC informed Basic Research that it had acted in bad faith because it had placed the third revised advertisement without first obtaining FTC's approval.[57]  The FTC also informed Basic Research that the third revised advertisement still violated the Agreement because it had determined that Basic Research could not state anywhere in the advertisement, under any

---

[51]  *Id.* at 50, ¶ 195.

[52]  Third Revised Akavar Advertisement (Dkt. No. 1, Ex. J).

[53]  *Id.*

[54]  *Id.*

[55]  Pls.' Compl. for Declaratory Relief, 52, ¶ 204 (Dkt. No. 1).

[56]  *Id.* at 52, ¶¶ 205–06.

[57]  *Id.* at 53, ¶ 208.

circumstances, "eat all you want and still lose weight."[58] The FTC further informed Basic Research that it did not sufficiently "qualify" its weight loss claims and the scientific evidence in support of those claims.[59] Instead, Basic Research had to convey that the science was uncertain, even though the study that Basic Research relied upon was a double-blind, peer-reviewed study.[60]

**Relacore Advertisements**

The FTC also has noted problems with Basic Research's advertising claims for Relacore. Basic Research contends that Relacore elevates a person's mood and reduces cortisol, which in turn, helps reduce stress-induced belly fat. Basic Research ran its Relacore advertisement for two years without complaint from the FTC.[61] When the FTC started questioning the Akavar advertisements, however, it also informed Basic Research that its Relacore advertisements lacked substantiation. In the November 2 Letter, the FTC acknowledged that "although some studies suggest that elevated cortisol levels are associated with abdominal fat, a cause and effect relationship has not be established *conclusively*."[62] Consequently, the FTC concluded that Basic Research's claim was merely theoretical and unsupported by competent and reliable scientific evidence.[63] Basic Research

---

[58] *Id.* at 53, ¶ 210.

[59] *Id.* at 53, ¶¶ 211–12.

[60] *Id.* at 29, 54, ¶¶ 111, 215.

[61] *Id.* at 56, ¶ 227.

[62] Nov. 2 Letter, 6 (Dkt. No. 1, Ex. C) (emphasis added).

[63] *Id.* at 5–6.

therefore provided more substantiation materials.[64]  The FTC found that lacking as well.[65]

Basic Research alleges that the FTC disapproves of its Relacore advertisement because it believes the advertisement states that Relacore reduces belly fat.[66]  Although Basic Research advertises Relacore as the "most popular 'Belly Fat' pill,"[67] it asserts the advertisement does not convey what the FTC says it does.  Rather, Basic Research believes "the advertisement makes the claim that dieting can be stressful, stress increases cortisol, cortisol increases belly fat, Relacore reduces stress, and Relacore, when taken in conjunction with diet and exercise, can help reduce stress-induced belly fat."[68]  The FTC disagreed and informed Basic Research it had to terminate the Relacore advertisement.[69]  Basic Research alleges the FTC's position concerning the Akavar and Relacore advertisements is troubling and breaches the Agreement because it imposes a vague, undefined standard about what constitutes competent and reliable scientific evidence.[70]

**Proposed Consent Decree**

In October 2008, the FTC informed Basic Research that it intended to bring a contempt

---

[64]  *See* FTC Letter (May 12, 2008) (Dkt. No. 1 Ex. K) (referencing additional studies that Basic Research had submitted).

[65]  *Id.*

[66]  *See* Pls.' Compl. for Declaratory Relief, 55, ¶ 224 (Dkt. No. 1).

[67]  *See* Relacore Advertisement (Mar. 18, 2008) (Dkt. No. 1, Ex. I).

[68]  Pls.' Compl. for Declaratory Relief, 55, ¶ 225.

[69]  *Id.* at 55, ¶ 221.

[70]  *Id.* at 35, ¶ 135.

action because Basic Research's Relacore advertisements had violated the Agreement.[71]  The FTC demand information not only about Basic Research's United States marketing and sales, but about all of its international marketing and sales as well.[72]  The FTC further informed Basic Research, however, that if it would sign a new consent agreement, it could avoid the contempt action.

Basic Research contends the FTC attempted to use the proposed consent decree to remove benefits the Agreement afforded Basic Research.  As stated above, the Agreement precludes Basic Research from making advertising claims unless it possesses and relies "upon a reasonable basis for the representation, which shall consist of competent and reliable scientific evidence."[73]  In contrast, the proposed consent decree states Basic Research is precluded from making advertising claims unless Basic Research possesses and relies "upon competent and reliable scientific evidence that substantiates the representation."[74]  Although both documents contain the same definition of "competent and reliable scientific evidence," Basic Research contends the FTC has attempted to nullify the reasonable basis standard that Basic Research bargained for under the Agreement.

To avoid litigation, Basic Research met with the FTC again on November 6, 2008.[75]  Mr. Kohm acknowledged that the parties had a fundamental disagreement regarding what evidence met the reasonable basis standard.[76]  Mr. Kohm elaborated that Basic Research's evidence did not meet

---

[71]  *Id.* at 56, ¶ 226.

[72]  FTC Letter, 1–2 (Oct. 24, 2008) (Dkt. No. 1, Ex. L).

[73]  Agreement, *supra* note 14, at 3, §§ I–II.

[74]  Proposed Consent Decree, 5, § III (Dkt. No. 1, Ex. L).

[75]  Pls.' Compl. for Declaratory Relief, 56, ¶ 229 (Dkt. No. 1).

[76]  *Id.* at 56–57, ¶ 230.

the reasonable basis standard because the FTC had an expert who disagreed with some of the stated conclusions.[77] The FTC then reaffirmed that unless Basic Research signed the proposed consent decree, it would initiate an enforcement action against Basic Research.[78] Rather than sign the proposed consent decree, Basic Research expended significant resources to obtain even more scientific evidence to substantiate its advertising claims, including evidence from professors and a medical director in the relevant field.[79]

Despite this additional information, the FTC concluded that Basic Research was still in violation of the Agreement due to its Akavar and Relacore advertising claims. Basic Research and the FTC continued to meet several times throughout the summer of 2009.[80] During such meetings, the FTC raised new and varied concerns about Basic Research's evidence.[81] Basic Research contends that it has presented its position to no avail at "every level of the FTC from the compliance staff, to the Bureau Director, to the Commission itself."[82]

Accordingly, Basic Research contends that there is a present existing dispute between the FTC and Basic Research about the meaning of the Agreement that cannot be resolved absent judicial intervention.[83] It therefore filed a complaint against the FTC on August 31, 2009. In the Complaint,

---

[77] *Id.* at 57, ¶¶ 231–32.

[78] *Id.* at 57, ¶ 233.

[79] *Id.* at 57–62, ¶¶ 234–43.

[80] *See id.* at 62–65, ¶¶ 244–66.

[81] *See id.*

[82] *Id.* at 64, ¶ 259.

[83] *Id.* at 64–65, ¶ 259.

Basic Research seeks: (1) "the interpretation and meaning of the reasonable basis standard;" (2) "a judicial declaration that the FTC is legally bound by the definition set forth in the Agreement and that the FTC may not unilaterally alter that definition;" and (3) "a declaration that the FTC's attempts to demand that [Basic Research] satisfy extracontractual requirements violate the Agreement and are invalid."[84]  That Complaint presently is before this court.[85]

Subsequently, on October 29, 2009, the FTC filed a related action (the "'972 Case") against Basic Research seeking to obtain monetary civil penalties and injunctive relief from Basic Research for alleged violations of the Agreement.[86]  Although the proposed consent decree only addressed problems with Relacore advertisements, the '972 Case involves both Akavar and Relacore advertising claims.[87]  On November 6, 2009, Basic Research filed a Motion to Consolidate the '972 Case into this action because both cases "involve the interpretation and enforcement of [the Agreement]."[88]  In the interim, the FTC filed a motion to dismiss ("Motion to Dismiss") Basic Research's Complaint.[89]  The FTC contends the court must dismiss this case because (1) Basic Research does not allege a valid basis for jurisdiction, and (2) it usurps the FTC's enforcement powers.[90]  This decision addresses these two motions.

---

[84] *Id.* at 3.

[85] *See* Complaint (Dkt. No. 1).

[86] *United States v. Basic Research, LLC*, No. 2:09-cv-972 (D. Utah Oct. 29, 2009).

[87] *See* Complaint (Dkt. No. 2 in Case No. 2:09-cv-972).

[88] Pls.' Mot. to Consolidate, 2 (Dkt. No. 10).

[89] Defs.' Mot. to Dismiss (Dkt. No. 8).

[90] *Id.* at 1–2.

<u>**ANALYSIS**</u>

## I.    STANDARD OF REVIEW

Rule 12(b)(1) motions to dismiss generally take one of two forms: "a facial attack on the complaint's allegations" or "a party may go beyond allegations contained in the complaint and challenge the facts upon which subject-matter jurisdiction depends."[91] Here, the FTC's Motion to Dismiss was a facial attack on Basic Research's assertion of subject-matter jurisdiction in the Complaint. "In reviewing a facial attack on the complaint a district court must accept the allegations in the complaint as true."[92]

## II.    JURISDICTIONAL STATUTES

Plaintiffs contend that this court "has subject-matter jurisdiction over this action pursuant to 5 U.S.C. §§ 702 and 704, and 28 U.S.C. § 2201."[93] The FTC asserts Plaintiffs' Complaint must be dismissed because none of these statutes confer jurisdiction.[94] While the court concurs these statutes do not confer jurisdiction,[95] this does not resolve the issue. "[A]ffirmative pleading of the precise statutory basis for federal subject-matter jurisdiction is not required as long as a complaint

---

[91] *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995) (citation omitted).

[92] *Id.* at 1002 (citation omitted).

[93] Pls.' Compl. for Declaratory Relief, 5, ¶ 10 (Dkt. No. 1).

[94] Defs.' Mem. in Supp. of Mot. to Dismiss, 5 (Docket No. 9).

[95] *Albuquerque v. United States Dep't of Interior*, 379 F.3d 901, 906 (10th Cir. 2004) (citing *Califano v. Sanders*, 430 U.S. 99, 105 (1977) (stating "the Administrative Procedure Act is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions) (alterations omitted)); *see e.g. Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671 (1950) (stating "The operation of the Declaratory Judgement Act is procedural only . . . . Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.").

alleges sufficient facts to establish jurisdiction."[96]  Similarly, "jurisdiction may be established by reading a complaint holistically, even though the jurisdiction asserted was expressly improper."[97]

Here, Plaintiffs have alleged that "[t]he adjudication and interpretation of a consent agreement with the FTC lies within the exclusive jurisdiction of the federal courts."[98]  When an action is founded on an agreement with a federal agency, it is "one arising under the Constitution or laws of the United States within the jurisdiction conferred by 28 U.S.C. § 1331 on the federal district courts."[99]  Although Basic Research did not identify this precise statutory basis for jurisdiction, its Complaint alleges sufficient facts to establish subject-matter jurisdiction under 28 U.S.C. § 1331.

## III.    THE ADMINISTRATIVE PROCEDURE ACT

### A.    Waiver of Sovereign Immunity

Although 28 U.S.C. § 1331 "grant[s] jurisdiction to federal courts over claims arising under federal law," it does not by itself "permit federal courts to hear claims against the United States."[100] The Administrative Procedures Acts ("APA") "provides a mechanism for judicial review of executive action by waiving sovereign immunity in cases in which plaintiffs sue the United States

---

[96]  *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 5 (1st Cir. 1999) (citations omitted).

[97]  *Id.* at 6 (quotations and citation omitted).

[98]  Pls.' Compl. for Declaratory Relief, 5, ¶ 12 (Docket No. 1).

[99]  *Hamilton Stores, Inc. v. Hodel*, 925 F.2d 1272, 1279 (10th Cir. 1991) (citations omitted) (finding federal question jurisdiction where a plaintiff sought a declaratory judgment regarding its contractual rights against a federal agency).

[100]  Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1622 (Oct. 1997).

for relief other than money damages."[101]  The scope of this waiver, however, is not unlimited. Rather, the APA limits review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."[102]  Thus, if a statute precludes judicial review or the "agency action is committed to agency discretion by law," the court cannot review it.[103]

Despite these limitations, the Supreme Court has declared the APA "must be given a hospitable interpretation."[104]  Consequently, "judicial review of a final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."[105] This means an agency must show by clear and convincing evidence that the legislature intended to preclude judicial review of a particular agency action.[106]  Here, the FTC has not cited any statute that precludes judicial review of this action.  Nor has it shown by clear and convincing evidence that this action is committed to agency discretion by law.  Those limitations are therefore inapplicable.  The FTC does contend, however, that there has been no final agency action.  For the reasons discussed below, the court disagrees.

**B.    Final Agency Action**

"For agency action to be 'final,' it: (1) 'must mark the consummation of the agency's decision-making process'; and (2) 'must be one by which rights or obligations have been

---

[101]  *Id.* at 1623.

[102]  5 U.S.C. § 704 (2006).

[103]  *Id.* § 701(a)(1)–(2).

[104]  *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (quotations and citations omitted).

[105]  *Id.* at 140 (citations omitted).

[106]  *See id.* at 141 (quotations and citation omitted).

determined, or from which legal consequences will flow.'"[107] Here, the FTC commenced an enforcement action against Basic Research in 2004 for alleged violations of the FTC's substantiation requirements.[108] The parties disputed what constituted "competent and reliable scientific evidence." In 2006, the parties entered into a settlement agreement to resolve the issue, which is embodied in the Order. Notably, the Agreement "was published and subject to public comment before being adopted by the Commission" in its Order.[109] Nothing in the Order indicates the decision is merely preliminary or non-binding. Indeed, the decision indicates the opposite. It sets forth a final determination of the FTC from which rights and obligations flow. Moreover, the FTC's Complaint that it filed in the enforcement action expressly acknowledges, "[p]ursuant to a settlement, the Commission on June 19, 2006, issued a *final order . . .* against Defendants."[110] The court therefore concludes that the Order constitutes a final agency action.

Since the Agreement was adopted, the parties have interpreted it differently. The FTC contends that interpretations by low-level staff of the FTC do not constitute final agency action, and therefore, the court has no authority to review them under the APA. This contention misses the point. Basic Research is not asking the court to review the interpretations of low-level staff. It is asking the court to declare the meaning of the Agreement itself. Because the Agreement is final and binding, it is subject to review by the court under the APA.

---

[107] *Potash Ass'n of N.M. v. Unites States Dep't of Interior*, 367 Fed. Appx. 960, 963 (10th Cir. 2010) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

[108] Pls.' Compl. for Declaratory Relief, 15, ¶ 48 (Docket No. 1).

[109] *Id.* at 7, ¶ 23; *see also* FTC Order, 2 (Dkt. No. 1, Ex. A).

[110] Complaint, at 4, ¶ 11 (Dkt. No. 2 in Case No. 2:09-cv-972) (emphasis added).

## IV.    RIPENESS

The FTC next contends that Basic Research's Complaint must be dismissed because its claims are not ripe.  "For a claim to be justiciable under Article III, it must present a live controversy, ripe for determination, advanced in a clean-cut and concrete form."[111]  "As applied to review of agency actions, the ripeness doctrine has two underlying rationales."[112]  First, it prevents "courts from becoming entwined in 'abstract disagreements over administrative policies.'"[113]  Second, it "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"[114]  To avoid improper entanglement, the Supreme Court has delineated two factors for a court to consider when determining "ripeness":  (1) "'the fitness of the issues for judicial decision  and [2] the hardship to the parties of withholding court consideration.'"[115]

### A.    Fitness for Judicial Review

"An issue is fit for [judicial] review if the agency's action presents a concrete and specific legal issue that has a direct, immediate, and continuing impact on the [pleading] party."[116]  "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or

---

[111]  *United States v. Wayne*, 591 F.3d 1326, 1329 n.1 (10th Cir. 2010) (quotations, citation, and alteration omitted).

[112]  *Utah v. United States Dep't of Interior*, 535 F.3d 1184, 1191 (10th Cir. 2008).

[113]  *Id.* at 1191–92 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).

[114]  *Id.* at 1192 (quoting *Abbott Labs.*, 387 U.S. at 148–49).

[115]  *A.O. Smith v. FTC*, 417 F. Supp. 1068, 1082 (D. Del. 1976) (quoting *Abbott Labs.*, 387 U.S. at 149).

[116]  *Maine AFL-CIO v. Superintendent of Ins.*, 721 A.2d 633, 636 (Me. 1998) (citations and quotations omitted).

the equivalent or denial thereof, or failure to act."[117] "'[O]rder' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."[118] "[A] pragmatic evaluation must be made of whether the" administrative action is substantially final and whether the alleged harm inflicted by the action "may not be prevented or significantly ameliorated by further administrative action."[119] A "baseline question is whether allowing more time for development of events would significantly advance [the court's] ability to deal with the legal issues presented or aid [the court] in their resolution."[120]

Here, Plaintiffs' Complaint is fit for judicial resolution at this time. The Agreement falls within the scope of agency action in that it was approved and adopted by the FTC and reflected in an order. It arose from a negotiated settlement between the parties and is the final disposition of the dispute between the parties. No further administrative action will be taken with respect to the Agreement other than enforcement of its terms. Moreover, no additional time is necessary for the development of events to advance the court's ability to interpret the Agreement. Indeed, the FTC has now filed a second enforcement action against Basic Research, which alleges violation of the Agreement. The Agreement is thus squarely before the court and fit for judicial review.

---

[117] 5 U.S.C. § 551(13) (2010).

[118] *Id.* § 551(6).

[119] *See Gordon v. Rush*, 792 N.E.2d 168, 172 (N.Y. 2003) (quotations, citation, and alteration omitted).

[120] *See Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003) (quotations, citations, and alteration omitted).

## B.  Hardship to the Parties for Withholding Review

"Under the second prong of the ripeness inquiry—the potential hardship of withholding judicial resolution"—the court "examine[s] whether the challenged action creates a direct and immediate dilemma for the parties."[121]  A plaintiff will not suffer hardship from the court withholding review if there are no immediate "sanctions for noncompliance, or if the potential sanction is *de minimis*;" on the other hand, if the agency action "puts the complaining party on the 'horns of a dilemma,'" the court should undertake review.[122]

In *Abbott Laboratories*, the Commissioner of Food and Drugs promulgated regulations that were "designed to implement [a] statute," which applied "to advertisements for prescription drugs."[123]  A number of drug manufacturers "challenged the regulations on the ground that the Commissioner exceeded his authority under the statute" by requiring advertisements to state "the established name of the particular drug involved every time its trade name is used anywhere in such material."[124]  For the drug manufacturers to comply with the regulations, they would have had to reformat and reprint advertising materials at great expense.  Yet, if they did not comply, they faced "serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs."[125]  Consequently, the drug manufacturers were placed on the "horns of a dilemma."

The Supreme Court concluded this dilemma was "sufficiently direct and immediate as to

---

[121] *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237 (10th Cir. 2004) (quotations and citation omitted).

[122] *A.O. Smith*, 417 F. Supp. at 1082–83 (quotations and citation omitted).

[123] *Abbot Labs.*, 387 U.S. at 138.

[124] *Id.* at 139.

[125] *Id.* at 153.

render the issue appropriate for judicial review."[126]  The regulations had "a direct effect on the day-to-day business of all prescription drug companies," and were "clear-cut."[127]  Moreover, they put the drug manufacturers in the type of dilemma the Declaratory Judgment Act was designed to ameliorate.[128]  Hence, the Court concluded that hardship would ensue if judicial review was withheld.

Like the drug manufacturers, Basic Research is on the horns of a dilemma.  It either must spend its time and resources altering its advertising materials to comply with the FTC's interpretation of the Agreement, or it must risk sanctions for continued use of advertisements that it believes meet the "reasonable basis" standard of the Agreement.  Indeed, absent judicial review, the FTC can involve Basic Research in a never-ending cycle where it makes a demand for additional substantiation, Basic Research complies, and then new demands are made based on the FTC's interpretation of the Agreement.  By exercising judicial review of the Agreement, and declaring its meaning, Basic Research will not be left to speculate about what is required.

## V.    INTERFERENCE WITH ENFORCEMENT ACTION VERSUS ENFORCEMENT OF A CONSENT DECREE

### A.    *Ewing* Analysis

Approximately two months after Basic Research filed its Complaint against the FTC, the FTC initiated an enforcement action against Basic Research.  The FTC contends Basic Research's Complaint must now be dismissed because it will interfere with the FTC's enforcement action and

---

[126]  *Id.* at 152.

[127]  *Id.*

[128]  *Id.*

that action provides an adequate forum to address Basic Research's claims.[129]  To support its

contention, the FTC cites to a line of cases following *Ewing v. Mytinger & Casselberry, Inc.*

In *Ewing*, food supplements were seized by the government on the basis that they were

misbranded "to the injury or damage of the purchaser or consumer."[130]  The government then

instituted libel suits against the distributor.  The trial court found, however, that the government had

not afforded the distributor a hearing on whether there was probable cause to seize the supplements

and it enjoined the government from proceeding in any action about the alleged misbranding.  The

Supreme Court reversed the trial court's ruling on the ground that it was improper for a trial court

to stay execution of seizure actions and halt an administrative proceeding while the court heard the

case because it precluded the government from protecting the public in a speedy fashion.[131]  Thus,

the *Ewing* line of cases preclude a court from enjoining enforcement actions, and on that basis are

distinguishable from this one because Basic Research does not seek to enjoin an enforcement action,

extend its scope, or dismiss it.  Rather, Basic Research is seeking declaratory judgment about the

legal meaning of the Agreement, which can then be applied to the facts at issue in the enforcement

action.  This case is therefore more in keeping with *Abbot Laboratories* than the earlier decided

*Ewing* case.

B.    *Alpine* **Analysis**

The FTC also relies on *Alpine Industries v. FTC* for the proposition that once an enforcement

action is filed, it precludes judicial review.  In *Alpine*, a consent decree also was at issue.  Under the

---

[129]  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, 7–11 (Dkt. No. 9).

[130]  *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 596 (1950) (quotations and citation omitted).

[131]  *See id.* at 601–02.

consent decree, Alpine agreed that it would not make representations about its air cleaning products, unless it "possessed and relied upon competent and reliable scientific evidence to substantiate the representation."[132]  Subsequently, the FTC determined that "Alpine's substantiation did not meet the 'competent and reliable scientific evidence'" standard, and it informed Alpine "it was recommending . . . that an enforcement action be filed against Alpine."[133]  In response, Alpine filed a complaint asking the court to declare that it had provided adequate scientific substantiation in accordance with the consent decree.[134]  The court held that if it "were to rule in such a manner, the FTC would be precluded from commencing an enforcement action."[135]

Alpine's request to the court significantly differs from the instant action.  Where Alpine asked the court to declare that it had "provided adequate scientific substantiation,"[136] it essentially asked the court to declare whether it had met the applicable standard.  Here, Basic Research is asking the court to *declare the standard* under the Agreement, not to determine whether it has met the standard.[137]  Declaring the standard does not impinge on the FTC's enforcement action because once the standard is declared, the FTC may still challenge whether Basic Research has "met the standard."

_____

[132]  *Alpine Industries v. FTC*, 40 F. Supp. 2d 938, 939 (E.D. Tenn. 1998).

[133]  *Id.* at 939–40.

[134]  *Id.* at 940.

[135]  *Id.* at 943.

[136]  *Id.* at 940.

[137]  Basic Research is seeking "the interpretation and meaning of the reasonable basis standard set forth in the Agreement."  Pls.' Compl. for Declaratory Relief, 3 (Docket No. 1).

### C.	Enforcement of a Consent Decree

While *Ewing* and *Alpine* focus on governmental enforcement actions, Basic Research contends the issue before the court is not the government's enforcement action but whether Basic Research can bring an action against the FTC to enforce the consent decree.  The court agrees.

In *Armour & Co.*, the United States filed suit, alleging that actions taken by the defendant had violated a consent decree.  The Court therefore undertook the narrow question of whether the consent decree had been violated.[138]  In doing so, the Court looked at the consent decree and interpreted it as one would a contract due to the nature of a consent decree.  Specially, the court stated, "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms."[139]  Consequently, "the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation."[140]

Once a decree is entered, "the *decree* itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve."[141]  The court then stated:

> For these reasons, *the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*  Because the defendant has, by the decree, waived his right to litigate the issues raised, a right

---

[138]	*See United States v. Armour & Co.*, 402 U.S. 673, 674–75 (1971).

[139]	*Id.* at 681.

[140]	*Id.*

[141]	*Id.* at 681–82 (emphasis in original).

> guaranteed to him by the Due Process Clause, *the conditions upon which he has given that waiver must be respected*, and the instrument must be construed as it is written, and not as it might have been written had the [United States] established [its] factual claims and legal theories in litigation.[142]

Inherent within this statement is the recognition that both parties to a consent decree are bound by its terms and that the court may enforce its conditions against either party to the agreement.

This conclusion is supported by *Elmo Division of Drive-X Co. v. Dixon.* In that case, the plaintiff had sued the FTC to enforce a consent agreement. Under the consent decree, the FTC had to follow certain procedural requirements to institute another enforcement action against the plaintiff.[143] When it failed to follow those requirements, the plaintiff filed suit, seeking both declaratory and injunctive relief.[144] The circuit court concluded that the consent decree was equally binding on the FTC.[145] As a result, the FTC could be required to abide by its terms, and it was inappropriate for the FTC to attempt to "unilaterally obliterate a part of the consideration—indeed an important part—by which it secured [plaintiff's] assent to be bound by [the consent] order."[146]

Likewise, in *Time Oil Co. v. Duncan***,** the parties had entered into "a Consent Order to settle their pending disputes."[147] Each party gave consideration for the consent order.[148] Subsequently,

---

[142]  *Id.* at 682 (emphasis added).

[143]  *The Elmo Div. of Drive-X Co. Inc. v. Dixon*, 348 F.2d 342, 343 (D.C. Cir. 1965).

[144]  *Id.*

[145]  *Id.* at 345.

[146]  *Id.* at 346.

[147] *Time Oil Co. v. Duncan*, No. C80-877, 1981 WL 1261, at *1 (W.D. Wash. Feb. 13, 1981).

[148]  *See id.*

the Department of Energy ("DOE") initiated an enforcement action against Time Oil.[149] Time Oil argued that the enforcement action breached the consent order.[150] Accordingly, it filed an action to estop the DOE from proceeding with its enforcement action.[151] Despite such a potential outcome, the court cited to a Supreme Court case indicating that a consent decree "should properly be construed as a contract."[152] The court then concluded that "[i]nasmuch as Time Oil was thus bound under the [consent decree], even so should DOE be held accountable. . . . The mere fact that DOE's breach may take the form of initiating administrative proceedings does not deprive the plaintiff of his judicial remedy."[153] Thus, the court had subject-matter jurisdiction to enforce the consent order, notwithstanding the impingement on the government's enforcement action.

The same reasoning applies here. Basic Research and the FTC exchanged consideration to be bound by the Agreement. The FTC intends for Basic Research to be bound by the Agreement, as is shown by the fact that it has now filed an enforcement action against Basic Research for an alleged breach of the Agreement. It therefore follows that the FTC likewise is bound by the Agreement, and Basic Research did not have to wait for the FTC to bring an enforcement action before it could assert its claims. Were that the case, the FTC could breach the Agreement without concern and avoid liability merely by abstaining from bringing an enforcement action. The fact that the FTC has now filed an enforcement action does not divest Basic Research of the right to enforce

---

[149] *Id.*

[150] *Id.* at *2.

[151] *Id.*

[152] *Id.* at *3 (citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37 (1975)).

[153] *Id.* (internal citation omitted).

the FTC's obligations under the contract. The court therefore concludes that judicial review of the consent decree is appropriate in this matter.

## VI.    CONSOLIDATION

Basic Research contends that upon the denial of Defendant's Motion to Dismiss, the cases should immediately be consolidated into the first filed action in accordance with both the federal and local rules. In its Motion to Dismiss, the FTC indicates that Basic Research should raise its allegations in the enforcement action that the United States has filed. "The basic concept behind a dismissal or transfer of these cases is to minimize the multiplicity of forums that must adjudicate the issues."[154] Often courts who have faced this issue have opted to transfer pre-enforcement litigation to the district where enforcement proceedings have been brought.[155] Typically, however, those cases involved multiple jurisdictions among plaintiffs and between the plaintiffs and defendants.[156] Here, not only did all of the plaintiffs file together in the District of Utah, but also, the FTC filed its enforcement action, the '972 Case, in the District of Utah. Therefore, the necessity does not exist to minimize the multiplicity of forums by consolidation into the enforcement action.

Moreover, Local Rule 42-1 indicates if a motion to consolidate is granted, the cases are consolidated into the case with the lowest number (i.e. the case first filed).[157] This court sees no reason to ignore the local rule and because this case predates the '972 Case, the court grants Basic Research's' Motion to Consolidate.

---

[154]  *A.O. Smith*, 417 F. Supp. at 1085.

[155]  *See id.* at 1085–86.

[156]  *See e.g., General Elec. Co. v. FTC*, 411 F. Supp. 1004, 1005, 1010 (N.D.N.Y. 1976); *In re FTC Corp. Patterns Report Litig*, 432 F. Supp. 274, 279 (D.D.C. 1977).

[157]  DUCivR 42-1.

## **ORDER**

For the reasons stated above the court ORDERS as follows:

Defendants' motion to dismiss is DENIED.[158]

Plaintiffs' motion to consolidate is GRANTED.[159]

DATED this 20th day of May, 2011.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[158]  Docket No. 8.

[159]  Docket No. 10.